This appeal arises out of the fact that, at a motion prior to trial, on the first day of the scheduled trial, the trial court prohibited the admission of all of Mr. Obrey's evidence that he had secured and was proposing to offer into evidence to prove that his non-commulsion to senior management position at Pearl Harbor Naval Shipyard was the result of a pattern and practice of the Navy to discriminate against minority applicants for senior management positions at Pearl Harbor in favor of white applicants. Mr. Obrey's evidence basically fell into four separate categories. The first category is direct evidence statements made by senior managers, the business manager and the controller of Pearl Harbor Naval Shipyard to a union official. The union official's name was Ben Toyama. He was prepared to testify that in his discussions with Robert Matsumoto, the business manager of Pearl Harbor Naval Shipyard, who was also a member of the leadership council of the shipyard commander, Mr. Matsumoto related to him of the Navy's plan to bring in white managers from the mainland, how to work with the workers for a three-month period and then rotate them out and then rotate them back in to take managerial positions within Pearl Harbor. Mr. Toyama would have testified and as we fully agree to the court, that Mr. Matsumoto made statements to the effect that this policy, this practice of importing white managers from the mainland by the Navy was because of his belief that the local managers were not good enough. Further, Mr. Toyama would have testified that when an email in which referenced to a gene pool of the Navy's policy of only recruiting for Pearl Harbor managing positions, other applicants from other shipyards to the exclusion of Pearl Harbor shipyards, that when he showed that email to Mr. Matsumoto acknowledged that it was wrong, that it was indication of race bias by the Navy in favor of white applicants for senior management positions and making the statements to Mr. Toyama, you local guys did not do a good job. And there's one thing that I'd like to point out and it's on the colloquialism. Here in Hawaii, when we refer to a person as being local, we are really referring to a person born and raised in Hawaii who is non-white. White individuals who are born and raised in Hawaii are normally called local Haoles. Haole being a Hawaiian term for a person of the white race. Mr. Toyama's testimony is fully set forth in the excerpts of our record, pages 297 to 311. It was submitted to the court on a motion for reconsideration in the middle trial. This order denying Mr. Toyama's testimony. We attempted to make the record clear, but also make it clear to the court the substance and the relevancy of Mr. Toyama's testimony. Counsel, if I may move you forward to it, beyond your list of four types of evidence, if I may. Speaking only for myself, it would appear to me that all of the evidence was relevant and typical for the kind of evidence that in excluding the evidence affected the result or probably would have affected the result. How do we assess the harmfulness of the district court's erroneous exclusion of all of this evidence? Your Honor is quite right when Your Honor says that the evidence that we sought to present was the typical type of evidence that a plaintiff's counsel would seek to garner up and present. Because unless you get statements to the effect where the selecting official tells the plaintiff, I did not select you because of your race or your gender, you are left with basically circumstantial evidence or evidence of negative disparity statement made by that individual to others. And so basically by taking out, excluding all of my client's case, we were precluded, one, from showing that there was a pattern in practice as shown by the statistical evidence that we attempted to show. First of the hiring practices after Harvard for a three year period, and then to the other naval shipyards to show that the disproportionate amount of white individuals who were selected for senior management positions. And what we were then left is that the Navy presented its testimony and we could not present evidence that the testimony was pretextual. They argued, for instance, that Mr. Obey was qualified, but wasn't as qualified as the person selected. And the basic reason that was stated was education. Well, the other test, Mr. Tyson, who was excluded from, has a college degree. Mr. Pastara has a college degree. When they, and we would have developed had we been permitted to offer their testimony, show that when they were not selected, there was an instance in which the only viable applicants, the only remaining applicants were non-white. And when that occurred, the captain of the Navy, and it was only after you had a white applicant who was not as educated, not as well educated as these three regals that the selection was made of a person who was white and not, but less qualified, less educated. So basically, we could not rebut the evidence presented by the Navy that they were relying upon non-discriminatory reasons. Yeah, but that doesn't really go to the explanation that the Navy offered here of Mr. Riley's qualifications. And that, of course, would go to the question before the court, which was whether Mr. Obey was discriminated against. And it does appear that Mr. Riley did have some qualifications that Mr. Obey did not have. We don't deny that. We don't challenge the fact that Mr. Riley had these qualifications, but we're saying that these qualifications are really a subterfuge to the predetermined decision made by the Navy to only select out of non Pearl Harbor shipyard managers who were predominantly white. If in this case, you have a, your client has been passed over by someone who you admit had excellent qualifications and had qualifications that your client did not, then that suggests that perhaps you've got the wrong plaintiff, given that you've got other evidence that other people may have been discriminated against at the shipyard. That may be the case, but Mr. Obey had qualifications that Mr. Riley did not have. And that is what we... He had over 20 years of experience working in the shipyard. He'd worked at COAL 900. He'd worked in the production department for a number of years. So he knew the individuals with whom he had to interface with, so that what he had was the wealth of experience of, as you could say, coming to the ranks and going to the shipyard, which you need to have proper and adequate supplies so that the men can do the work, and an unblemished record in terms of doing non-submarine ship overhauls. He had, at the trial, represented testimony about the fact that 95% of the surface ship overhauls that he was in charge of came within budget and on time. Mr. Riley did not have that kind of record. But all of those things that you've just suggested about Mr. Obey were acknowledged by Captain Edwards. That is correct, but what we would have liked to have been presented is to show that in other instances, when there were qualified non-white applicants, who were the only qualified applicants that were available, the Navy chose to cancel those recruitments. But again, those were the positions that Mr. Obey was not applying for. They were positions that were senior management positions. Right, but that wasn't Mr. Obey's position. They didn't cancel the position for which Mr. Obey applied for. They did. They did in August 2000. There were only, as we stated in our brief, your honor, it was first Mr. Chamberlain, who was a white applicant from Puget Sound. He was chosen by Captain Connors and offered the position. He declined that position. Captain Connors then went down the list and he chose, he selected, offered the job to Mr. Riley, the same person who later on took the job. Mr. Riley turned it down. There were other applicants who hadn't been qualified. Captain Connors chose to do, instead of picking from that pool of qualified applicants, but because they were from Pearl Harbor, because they were non-white, he chose to cancel it, giving the lame excuse that he's going to be rotating out of Pearl Harbor several months down the road, and so he should let his successor do it. His successor comes in and asks Mr. Kawachi. Mr. Kawachi went through four selection processes. And by the way, this email that we sought to bring in refers to Code 130, the job that Mr. Kawachi applied for, quality assurance manager, and Code 900, resource production manager. That is the job that Mr. Olby applied for. In that email, Captain Connors articulates the Navy's policy of recruiting for senior management position from other shipyards. And further, what the judge excluded was evidence that the other shipyards, the command, the policy was set by George Nanos, who was the commander of all naval shipyards. He stated that in his deposition that he ordered his shipyard commanders to seek qualified applicants from the other Navy shipyards, because he wanted to, as he said, cross-pollinate. But when you look at the results, Admiral Nanos identified Horsemouth as being predominantly white. He identified Puget Sound Shipyard as being predominantly white. He identified Norfolk as being a mixed management crew. And he identified Pearl Harbor as being primarily Asian Pacific Islander senior management. When you look at the two non-white identified by the Admiral, what do you have? You have Norfolk. All the out-of-shipyard managers who were selected were all white, not Hispanic, not minority. All nine of the Pearl Harbor shipyard selections, all nine were white individuals. And that is the kind of evidence that we would have liked to have been presented, so that we could show that the articulated reason for the non-selection of Mr. Obey was part of a pattern that had been ordered by the Admiral, and how it was implemented was through substitution. And we were precluded from doing that. How many times did Mr. Obey get on a list that was terminated? We know this happened with regard to Riley, but how many times was he put on a list, and then when it came down that they had taken all the folks that you say were the white folks, and then they were looking at the locals, that the process was terminated right over? I'm sure of one, there was possibly two. The second time he applied for, he made the, there was two different methods that they used, but he was qualified on both, but I believe it was definitely one where they canceled it. He filed an EO complaint as a result of that cancellation. As is Mr. Kawachi, Mr. Kawachi's complaint was, as Mr. Obey's complaint was, administratively dismissed, then was reinstated by the Equal Employment Opportunity Commission. But in each case, what happened was, there was the advertisement, and then your client would apply to get on the recommendation list. Some other body made a recommendation list. Well, no, not some other body. What they did is they rated the individuals according to qualifications. No, but if some other group within the Navy made it, and the commander's the one that makes the last decision, right? So he gets on the list because someone's looked through the applicants and said, we will rate these folks. And the only complaint you would have is that because he was rated, and when they lost the top qualifier, that they stopped the process and restarted. Your then claim is the fact is that they stopped after they finished looking at the white applicants, but the locals, as they put in the email, they would not go below. They're saying that we can't rely on that. We want to add this influx from the outside. Now, if that's the case, as Judge Bivey said, your discrimination has to be based upon that job versus taking some other jobs from other people that Judge Reel excluded because they had their own processes. They weren't in this process with this person. Well, the request that we've made that was part of the statistical analysis was for GS senior management positions, and it was defined as GS 13s, 14s, and 15s. But because this job has its own characteristics, you wanted to bring other selection processes in to show that there was a general discrimination. That is correct, Your Honor. There was a general discrimination against minority applicants for senior management positions at Pearl Harbor. And Judge Reel and the standard of review of his decision was abuse of discretion. He said, I don't want to try those other folks' cases because they weren't involved in your process with this job. Isn't that basically what he said? Well, he not only said that, but he said basically, I'm not going to permit you to present your evidence to prove your claim of discrimination. No, but it has to go to the materiality function. And the fact is that I was just trying to make sure that these people were not involved in the same process that your client was at all times. They were, but not for the same job. They were not applying for production. Exactly. And because the relative qualifications of the people in that line had to do with the production job. That's correct. Okay. Counsel, you have about two and a half minutes if you'd like to save some time for rebuttal. May it please the Court, Jeffrey Clare again for the federal applicants. Your Honors, without conceding that the point that the exclusions of evidence were appropriate, let me turn directly to Your Honors' concern as to whether, assuming they weren't appropriate, that was prejudicial error. Well, just again, speaking only for myself, I read your brief and it was a wonderful jury argument, but it struck me that it ought to be made to a jury. And I'd like you to talk to me about the following issue. The key thing that the plaintiff has to prove is what's in the mind of the decision maker, whether there was an intention to exclude him because of his race. And in figuring out the thought process of a decision maker, ordinarily in these kind of cases, you look at other decisions that the same decision maker has made in similar, albeit not identical, circumstances to see if there's any inference that permissibly can be drawn from that. Why isn't that what the plaintiff was trying to do here? And why isn't that a completely legitimate way to prove or attempt to prove at least his case? Well, again, assuming that that evidence should have come in, and the test for prejudicial error would be whether the court's persuaded that it's more likely than not that the verdict would have been different if this evidence that was proffered would have come in. Now, speaking in a disparate treatment case, it is true, it is often the case that what the plaintiff wants to show that there is a kind of systemic bias against people in the same protected class. And in order to show that, plaintiffs will come in with statistics that purport to show, for example, that there is a disproportionate difference between the minority composition of the qualified applicant pool and the composition of the pool of people who are actually selected. Now, the reason that evidence can come in is because if all other things are equal, if all the applicants, minority and non-minority, really have a similar background, similar education, training, and experience, if you control for those factors and see the statistical disparity, then it can give rise to an inference of discrimination. Now, there is no claim that Mr. Obrey was not at least minimally qualified for the position for which he applied. That is true, Your Honor, but there is a great variation among candidates who are minimally qualified. One can be minimally qualified by having the appropriate crime in a certain grade in the Federal Service and meeting some very broadly defined qualifications. But what that means is that the focus of the case is, as Plaintiff's Counsel says on pretext, because this person is qualified. Your claim is, well, someone else is more qualified. And then, at least theoretically, he's permitted to come back in and say, well, that could be a legitimate reason. But in this case, because we can demonstrate what was in the mind of the decision maker, we know that that wasn't the real reason. Now, a jury might disbelieve that. It's true. And so I guess what you're saying is, well, we'd have to be really, really convinced that a jury would have believed that. So how convinced do we have to be? Well, again, I think the Tennyson case, I think, articulates the standard of review for harmless error. The court has to be persuaded that it's more probable than not that the finder of fact would have come out differently if the evidence had been admitted. Counsel, which way does the presumption run? As I read a couple of these cases, it looks like we stated two different cases. In one, we find prejudice only if it's more probable than not that error tainted the judgment. In the other one, it looks like that we find prejudice unless we can conclude that it is more probable than not that the result was untainted by error. Now, those are two different statements. Both of them have similar words, but they're reorganized. And one of them begins with the presumption that there wasn't prejudice unless you can find it. And the other assumes that there is prejudice unless you can find that there wasn't. So what test do we apply here? Well, that's an interesting point and not one that had occurred to me in reading the cases. But because there has been a whole trial on it and because I know that there is a systemic interest, part of the reason there is the harmless error standard is that the law doesn't require a perfect trial. It allows for some error. And there is a systemic interest in not having the sort of waste of judicial resources of simply overturning the whole trial and starting again. So from that premise, I would argue that the presumption has to be in favor of preserving the trial. I'm just trying to argue from some principles. However, it raises an interesting point and not one I can answer from the knowledge of the case. I don't understand your answer because before you get to the presumption of the trial, you have to determine what standards we're using for the harmless error. And if it's presumed that there is no prejudice, then the trial starts under that presumption. We look at the evidence. But if it's presumed there is prejudice, the trial starts at a different point. And furthermore, there's another confusion I have, and maybe I misunderstood counsel. I understand counsel to say that what he wanted to do was not track Obrey's line of applications. In other words, a specific job in a specific area, the supervisor. What he was trying to track is all of the supervisor hiring positions. So put that as a group of supervisors. And he was trying to track the discrimination against all of those to show no matter where Obrey was in this line, there was this overriding discrimination against the local in the sense he's divided. And so whenever you had a line of a job and you had all these folks that were recommended where Obrey was in one of these lines, the moment they got to the local bottom, bingo, they stopped the process. Now, that seems to be a harder thing to deal with than this thing you're dealing with the harmless error because he never got his evidence in. And so we're sort of stuck back to evaluating what would have happened on counsel's argument that there was this overarching discrimination on everybody. In other words, no matter who you were, once the line came down to everybody being rejected down to the local level and his examples were other folks that were in that line, that automatically there was this discrimination. I don't know how to put that into the harmless error standard unless you just take Obrey's line and say, well, there was no discrimination against Obrey because he was less qualified than someone else. I think counsel's arguing something else. Your Honor, let me try and address that by talking about the kind of relative weight that the evidence might have here. On the government side, the evidence that is in the record is evidence from this decision-making process. There's evidence that the minimally qualified applicants were screened by a group of four different people, including two Asian Americans, two people who identify as Asian Pacific Islanders, and they were unanimous in concluding that the selected candidate was the best candidate for the job. True, it was. See, that's where I get lost. True, it was the best candidate, but Obrey was also in the track. And counsel's argument, unless I'm followed up, your counsel's argument is as long as you're in the track, if it gets down to you because others above you in the track rejected the job, that automatically can't be stopped. In other words, why did you throw me out? I'm in the track, even though others were rated higher. So there's got to be an overarching then argument which may be within the process that I should have my evidence in so we can go to see whether or not you're giving me the wrong argument for recommending, not taking me. Well, if we're focusing on why the initial selection processes were stopped, the evidence is the testimony of Vice Admiral Nanos, who was the head of the entire Naval Sea Systems Command with responsibility for all four naval shipyards, who said that he wanted a policy where applicants for these jobs were drawn nationally, where there's a national competition because he felt that was the best way of getting the best candidates, and because he expressed within his deposition a kind of systemic interest in making sure that there is a kind of standardization of skill sets among all the employees in all four shipyards. Well, again, that is a legitimate reason, but it cries out for a plaintiff's lawyer to try to demonstrate, if possible, but it's a pretextual reason, and that is by standardizing and looking nationally at the existing pool of managers, we're looking at a pool of white people, and that a jury could find that that's absolutely fine because the business reason is important and it's legitimate, or it could be found to be pretextual, but when all of the evidence of pretext is foreclosed, I guess I don't see how we can conclude that that's harmless. Well, let's look at the evidence on the other side, that there might be pretext. There are these statistical analysis of approximately 160 senior managerial positions that were filled at Pearl Harbor over a two- to three-year period, and the expert testimony would have been that there is a statistical disparity in the minority proportion of the applicant pool as compared to the proportion of the selected pool, but it's established that there was no analysis of the resumes of any of these applicants. There was no attempt to try and control for great differences in training and education and experience among the minority pool. All of which is excellent material for cross-examination. Well, we would submit it, as we've argued in the brief, that it goes to the relevance under 401 and to whether it's appropriate expert testimony under 702. If you're not comparing apples to apples, if you don't really look to see that you are looking at people of similar training and education and experience, then there is really no statistical inference that can properly be drawn from that information. So the evidence has no probative value whatsoever with the opposition. It falls under the attitude that there are liars, damnable liars, and statisticians. It is prejudicial in the sense that it gives the impression that there is racial discrimination, but it's an impression that doesn't rest on sound statistical principles. So we'd say it's not relevant because it has no weight at all. It doesn't make a fact of consequence to the determination more probable than not. It is simply bad statistics. It's not good evidence. You have the evidence that was offered about how three other applicants were not selected for promotions. Well, that, when it's faced, doesn't really tell you anything about the reasons why those applicants were not selected. It's different from a case where the sort of bad motives of other decisions are clear. This is not a case where management has directed racial epithets at someone else in the process. No, but it appears to me that you're complaining that the statistical evidence doesn't have enough information about individuals and that the individual information is no good because it's not statistical. I mean, it seems like you just don't want to allow any kind of evidence that might suggest that the decision-maker has in mind a certain kind of outcome. Well, I agree with the first part of Your Honor's statement I would agree with, but not with respect to the exclusion of the testimony of three other employees who say they were denied promotions. These were different promotions for different positions. Did they have a common decision-maker? I am not sure the answer to that. I know the decision-maker in this case was new to the job, so my surmise from that would be that they would have had at least a different commanding officer, and I'm not even clear whether the commanding officer was the selecting official in that case. In any event, the judge excluded this testimony because in order to establish that there really was discrimination in those other three employment decisions, you would have had to try the very same things for all three of those witnesses that you're trying here. You would have to have a mini-trial with respect to the making out of prima facie cases. I understand that rationale, and where I'm getting lost is in two areas, and I'm glad you brought up the statistical. The statistical thing seems to fall under Daubert and junk experts, and what you're saying is because the judge is supposed to, under Daubert, have this gatekeeping, that when he looked at this evidence, he thought not the statistical method, but what he was doing was junk because it didn't have the reliability because we don't know what the qualifications of those people were, and he just extrapolated a result. No proper inference could be true. Okay, so we'd have to look and see whether he did the proper Daubert analysis, and whether or not he was a proper gatekeeper. That's on one side. On the other side, it sounds like counsel was saying on behalf of his client that those other three folks go back to where I was talking about these lines that were developed because when a job came open for a supervisory position, there's a recommendation. One, two, three, four, five people. And not only did Overy, but all these other folks got in these lines of recommendation, and they always were low on the line. They weren't toward the top. And if the record supports this, what I thought counsel said, whenever when Overy got in the line, the moment they finished checking out the white folks and offering them the job and they all declined it, they stopped the process. And I think what he's trying to say, and I don't know if the record supports this, that the same thing happened to these other three, so their evidence would come in to show this overarching system, if you will, that they would not go below a level of the white folks when they got to the locals and as supported by the email. Now, that seems to be two different ways that you have to analyze, including when you get to the harmless analysis test. If the contention is whenever the sort of top qualified white candidates don't take the job, then the selection process would stop not only here, but elsewhere. If that's the contention, I know that there are, with respect to some of the senior management positions, the lists in the record of who made the top ten, basically the best qualified. I don't believe, however, there's any evidence as to those selections that the process simply stopped when somebody, when the white folks. And what was the proffered evidence as to those folks? Well, you would have to have, again, the same sort of trial. No, forget about the trial, but what was the proffered evidence that was excluded because there was a proffer made about what these folks were going to be testified, and then Judge Real said, no, I'm not going to go into those individual cases. The evidence was that these three individual employees who were denied promotions were going to testify that they had been discriminated against in their selection. And in order to, now what plaintiff wants to show is that this is evidence of systemic discrimination here. There's been discrimination against these other people, so there's been a disparate and a discriminatory animus against me as well. Are you saying that the proffer on behalf of the other threes was insufficient then? Or that the fact that they were offering themselves in their program and their process was left out because it was too much of a chore to go through their discrimination process? It's more though, there's some of the former, but it is more the latter. I think the judge's concern in what was argued to the trial court by the government below was that you really have to have a mini-trial on each of these. The fact that these people were not selected is not itself evidence that there's a bad motive. You would have to establish through the sort of McDonnell-Douglas prima facie case burden shifting analysis with respect to each of those witnesses that there had been discrimination in those different selection processes. But his overarching discrimination claim almost forces us there, as Judge Graber says, because how else would you show that it crosses not only the line of decision-making in Obrey's job, but these other folks who say, hey, we've got the same problem, because the link is supervisory positions at Pearl Harbor with no locals being chosen. That's, I think, the basis of the claim. It could be shown with more appropriate statistical evidence, where there were better controls for factors other than race. Well, you're going back to the first element, then. The proffer was not sufficient. That's one example, I think, of how the plaintiff could establish it. There could be better evidence of discriminatory animus in remarks made by people in the selection process. This goes to the Toyoma testimony. There are several reasons why that kind of testimony didn't come in. This is testimony of remarks allegedly made by the business manager and controller, not people who were involved in the selection process. This was evidence of remarks made in 1998, two years before this selection process commenced and two years before the selection. Who made the gene pool comment? That was the former commanding officer of the ship. That evidence did come in. It was argued to the jury, and it came against the jury's results. That is not one of the exclusionary issues of the court. At bottom, Your Honor, the evidence in this record shows that the government made this decision to pick Mr. Riley for the position because it felt that Mr. Riley is the best qualified person for the job. He had, by comparison to Mr. Obrey, far better training and experience. Mr. Obrey does not have a college degree. The selected candidate has a college degree and a technical major, a master's degree in mechanical engineering, a master's degree in business administration. Mr. Obrey had supervised a unit of 150 people. The selected candidate had supervised 1,300 people as the commanding officer of the shipyard facility. There was a night and day difference in the qualifications for this job and the applicants for this job, and they were cited as the reasons for the selecting official's decision. What you have counterpoised against that, if all the evidence has come in, was this very sort of questionable statistical evidence that really wasn't performed in a way that permits appropriate statistical inferences to be drawn. You have the testimony of three other people who applied for different jobs, with all this speculation as to why they didn't get those jobs. And you have the testimony about remarks made by the controller and another official who had no role in the selection process at issue here, and remarks that were two or three years before the selection process was completed. To balance the evidence against each other, including the evidence that was excluded that might have come in, even under a more onerous standard for prejudicial error, which is that the court would have to come out the same way. Thank you. Thank you, counsel. I believe you have some rebuttal time left. Let me touch on the e-mail, Your Honor, which is the first document in our executive record. That e-mail was not admitted. That e-mail was excluded. The only way in whom the remark was gotten in before the jury was that through the testimony of George Donnells, the admiral of the Naval Sea Systems Command, who testified that in the context of telling or ordering Captain Connors to apologize for that remark, that remark was referenced. However, the e-mail itself was never admitted into evidence. So what portion of the e-mail that was not admitted was, in other words, was the relevant portions of the e-mail admitted? Not entirely, because there was no reference in his testimony of the response of the other commanders within the Naval Command. So you're talking about Admiral Nanos when he testified? Yes, he testified. And what the judge did was to exclude testimony of George Nanos that went to his knowledge of the racial breakdown of the senior management of each of the shipyard. His knowledge as to who was selected in terms of the persons, the senior managers that were actually selected by his shipyard commander when they are implemented his decision. In other words, what you had was they excluded evidence that six out of the six senior managers selected from other shipyards were white. They excluded evidence that all nine senior managers selected during Admiral Nanos' term for Pearl Harbor were all white. And I would like to correct one question that Your Honor may have, and that is that the local applicants were just as qualified as the white applicants. They were not marginally qualified. We asked for information from the Navy. Give us the data of individuals who applied for and were deemed qualified by you, the Navy, and also give us their racial breakdown and give us the racial breakdown of the person selected. Well, they had to be qualified because they were on the recommendation list. In each case, I take it. Yes, that's correct. We're not minimally qualified. They were just as qualified. Well, does the record show and specify these people are all equally qualified? They were, yes. Well, how did they get a rating then? Why would they be rated? Well, Mr. Matsumoto, the business manager who made this racial statement about locals not being considered good enough by the Navy, he was the rating official who did the rating, and he was part of the panel that did the selection on Mr. Ogle. Now, of that panel, of the who, you have five locals and two whites. The white person was selected, David Riley. Thank you, counsel. The case just argued is submitted. We very much appreciate the arguments from both parties. We will take a ten-minute break before hearing the remaining small portion of our morning calendar. Thank you.
judges: Brunetti, Graber, Bybee